IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE ESTATE OF MEYERS


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE ESTATE OF THERESA A. MEYERS, DECEASED.

CLAIRE WEIDES ET AL., APPELLEES,

V.

SHIRLEY CLOUSE ET AL., APPELLANTS.


Filed July 8, 2025.    Nos. A-24-625, A-24-626.


Appeals from the County Court for Douglas County: JEFFREY L. MARCUZZO, Judge. Affirmed as modified.

Claude E. Berreckman, Jr., of Berreckman & Bazata, P.C., L.L.O., for appellants.

Matthew Wurstner, of Carlson & Blakeman, L.L.P., for appellee Carlson & Blakeman, LLP.


RIEDMANN, Chief Judge, and BISHOP and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

In this consolidated appeal, the issues presented center around attorney fees paid to a law firm for work performed for the Estate of Theresa Meyers (Estate), and the Theresa A. Meyers Revocable Trust (Trust). The successor personal representative of the Estate and numerous devisees and beneficiaries of the Estate and Trust (collectively Appellants) appeal from the Douglas County Court's order denying their petitions for review of compensation on the basis that the attorney fees charged and collected by Carlson & Blakeman, LLP, were fair, reasonable, necessary, and not excessive. Appellants contend that the court erred in failing to address the enforceability of the written fee agreement; failing to find and consider Darren Carlson's conflict

- 1 -

of interest and the results obtained during the representation; and finding that the attorney fees charged and collected were fair, reasonable, necessary, and not excessive. For the reasons stated herein, we affirm as modified.

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

In April 1995, Theresa hired an attorney, Robert Luebbert, to create the Theresa A. Meyers Revocable Trust and fund it with certain assets. At that time, Theresa also executed a pour-over will which provided that any assets not transferred to the Trust during her lifetime would pour-over into her Trust at death, making her Trust her primary asset transfer mechanism.

Over 2 decades later, in April 2017, Theresa engaged a different attorney, Carlson of the Carlson and Burnett law firm, to execute a superseding will that was designed to transfer assets in her Estate to certain named beneficiaries, some of whom were different than those that had been named in her Trust. The superseding will was not a pour-over will, in contrast to her previous will. The superseding will named Kevin Weides as the personal representative of her Estate. At that time, Theresa also executed a durable power of attorney that designated Kevin as power of attorney in the event Theresa became incapacitated and she created a revocable transfer-on-death deed (TODD) transferring ownership of her residence to certain named beneficiaries upon her death. Sometime in 2018, Kevin also became a joint owner on certain Wells Fargo bank accounts owned by Theresa. At the time Carlson drafted Theresa's superseding will, power of attorney, and TODD in April 2017, he was apparently unaware of the existence of the previously funded Trust and pour-over will.

In April 2018, only 1 year after drafting the aforementioned documents for Theresa, Carlson, in his capacity as Theresa's attorney, filed a petition for temporary guardianship and conservatorship in the county court for Douglas County that alleged Theresa was unable to make reasonable decisions and requested that the court appoint Kevin as Theresa's temporary guardian and conservator. The court rejected the petition because of the existence of the power of attorney.

In March 2020, after Theresa had been diagnosed with "moderately severe dementia," Kevin reached out to Carlson to ask when the power of attorney became active. Carlson advised Kevin that the power of attorney was active due to Theresa's dementia diagnosis. Theresa passed away on May 25, 2022. Following Theresa's death, Carlson, who was then affiliated with the Carlson & Blakeman law firm, undertook representation of Kevin in Kevin's capacity as personal representative for the Estate.

About 1 month later, in June 2022, Carlson discovered the existence of the Trust that named Robert Weides and William Stauffer as cotrustees. Shortly after this discovery, Carlson & Blakeman began representing both Robert and Stauffer in their capacities as cotrustees. At that time, it was believed that the value of Theresa's entire estate was around $2 million and would be distributed to 51 separate beneficiaries. Although no written attorney fee agreement was drafted or signed at the time Carlson began his representation of the Estate and Trust, Kevin, as personal representative of the Estate, and Robert and Stauffer, as cotrustees of the Trust, orally agreed for Carlson's attorney fees to be charged at a rate of 2 percent of the final gross Estate and Trust assets.

After this oral agreement regarding attorney fees was made in early August 2022, Carlson discovered that the Trust owned 39,743 shares of Hershey stock valued at nearly $8 million.

Following this discovery, Carlson reduced his 2-percent attorney fee to 1 percent of the gross estate but reserved the right to increase back to 2 percent if litigation or disputes subsequently arose. Because the Hershey stock shares were in paper form and registered with a third-party service, Carlson had difficulty distributing them. Because of this difficulty, in March 2023, Carlson petitioned the county court for directions and requested permission to liquidate the shares of Hershey stock and then distribute the proceeds to the nearly 51 beneficiaries. The court granted the request. Throughout his representation, Carlson held funds obtained from the Estate and Trust in the law firm trust account, most of it distributed from dividends paid from ownership of the Hershey stock.

In January 2023, Stauffer, who was previously represented by Carlson, retained Susan Spahn to represent him in his capacity as a cotrustee. After being retained, Spahn emailed Carlson to express concerns about how the Estate and Trust were being managed including her discovery that Kevin, while acting as Theresa's power of attorney, failed to file tax returns for Theresa and engaged in pre-death transactions. Spahn also expressed concern that Carlson had a conflict of interest in representing Kevin as the personal representative since he previously represented Kevin in his capacity as the proposed guardian and under the power of attorney. Carlson alleged that he contacted the counsel for discipline at that time who advised him that no conflict existed. Carlson alleged that none of the attorneys involved in the matter requested that his law firm withdraw from representation or filed a motion with the court seeking their removal.

In November 2022, the initial inventory detailing the property owned by Theresa at the time of her death was filed and identified $11,252,823.81 in assets. In March 2023, Kevin, as personal representative, filed an amended inventory. Despite requests for statements and information on various accounts, Carlson informed other legal counsel that there was no need for a forensic review of the accounts Kevin was handling for Theresa. After subpoenaing Wells Fargo Bank Statements, it was discovered that during Theresa's lifetime, Kevin became a joint title owner on Theresa's Wells Fargo bank account and that, between October 2021 and April 2022, and while acting as Theresa's power of attorney, Kevin borrowed $6,400 from Theresa's account of which he was a joint owner. Although the Wells Fargo account was listed as a joint bank account, the $6,400 borrowed by Kevin was not included as a debt in either inventory filed in the Estate. After discovering the loans taken by Kevin, Carlson notified all 51 beneficiaries in a March 2023 letter. That same month, numerous beneficiaries of the Estate filed a petition for the court to remove Kevin as personal representative and to appoint a successor personal representative. On March 24, 2023, Carlson attempted to circulate his first written fee agreement which purported to change his attorney fee from a percentage of the combined gross estate to an hourly fee. The fee agreement was signed by Kevin and Robert, but not by Stauffer. In April, Kevin resigned as personal representative, and Gregory Weides was appointed as successor personal representative.

On April 10, 2023, Carlson filed a motion to withdraw as counsel for both the personal representative and cotrustee. Carlson indicated that his firm withdrew due to difficulty in getting information from Kevin and because Carlson believed that anyone affiliated with Kevin would no longer be trusted by the other beneficiaries and, consequently, it would be easier for everyone involved to obtain new counsel. Carlson's request to withdraw was granted by the county court.

Despite Carlson's withdrawal, due to impending deadlines, he continued working with replacement counsel in finalizing the Inheritance Tax Worksheet, the Estate Tax Return, and

liquidating the Hershey stock, which had to be done in $1 million increments due to difficulties in finding individuals who could effectuate the necessary medallion signature guarantees. Also, despite Carlson's withdrawal as counsel, he continued to bill the Estate and Trust for services. Upon withdrawing, Carlson paid his firm $90,020 in fees for 314.3 hours worked in the Estate matter and $76,320 in fees for 245.8 hours worked in the Trust matter. He also charged a $5,000 flat fee for managing the sale of Theresa's home. In total, Carlson charged $171,340 in fees even though the Estate and Trust matters had not been completed and no distributions had been made. Carlson paid the fees directly from his law firm's trust account.

In January 2024, Appellants filed a petition for review of Carlson & Blakeman's compensation in both the Estate and Trust cases alleging that the $171,340 in fees charged was excessive. Also in January, Gregory, as the successor personal representative of the Estate, separately filed a motion in the Estate case to set an evidentiary hearing over the reasonableness of fees, and attached an expert opinion from attorney Jonathan Grob, regarding the excessiveness of the legal fees charged and collected by Carlson. A consolidated trial was held in July 2024.

## 2. TRIAL

During the trial, testimony was adduced from witnesses including Luebbert, Theresa's original attorney; Spahn, the attorney representing Stauffer in his capacity as a cotrustee of the Trust; Matthew Wurstner, an attorney at the Carlson & Blakeman law firm; Kevin Dostal, an attorney called on behalf of Carlson & Blakeman; and Carlson. Additionally, the court received numerous exhibits including statements of legal fees charged by Carlson & Blakeman, a written fee agreement, various letters and emails detailing the status of the case between legal counsel, Federal Estate Tax Return documents, and a report from Grob identifying 80 hours of problematic time billed by Carlson & Blakeman and suggested that the law firm's bill should be reduced by 15 to 25 percent.

### (a) Grob's Report

In Grob's report, he attested that he reviewed Carlson & Blakeman's billing statements, Theresa's will and Trust documents, the court case file, Form 706 of the Federal Estate Tax Return, and the electronic file of Carlson & Blakeman. Grob opined:

> In connection with my review, I noted the hourly rates charged by various members of the Carlson & Blakeman firm. . . It is my opinion that the hourly rates are reasonable" and that he had "no reason to believe that the allocation of time between the Estate and the Trust was improper. Therefore, it is my opinion that the allocation (54.12% for the Estate and 45.88% for the Trust) is appropriate.

However, as it related to the total fees charged to the Estate and Trust, Grob stated that the fees "are higher than what I would normally expect to see for similar estate and trust administration." Grob identified ten separate entries which he found problematic:

> The entries noted above total approximately 80 hours. Many entries in the bills, in addition to the ones noted above, appear to require significant amount of time to perform routine tasks such as updating beneficiary information, creating lists or spreadsheets concerning the estate, reviewing emails, and drafting pleadings. I am also concerned as to

- 4 -

whether the time entries were created contemporaneously with the performed tasks. Even assuming that they were, as noted, many entries appear to include total hours for tasks beyond what I would expect for an estate of this nature and many times two lawyers and a legal assistant were working on the same task, often at the same time.

In addition to the foregoing, I note that the assets of the Estate and Trust include a home, publicly traded investments (including stocks and bonds), bank accounts, a life insurance policy, and miscellaneous tangible personal property. In my experience, the administration of an estate like this is rather simple. In addition, Carlson & Blakeman did not prepare the Form 706 nor the Form 8971. The simplicity of the composition of the Estate and Trust lends itself to a lower fee. On the other hand, it is acknowledged that there are many beneficiaries, two governing documents (the Will and the Trust), and the composition of an Estate or Trust is not necessarily determinative of the amount of the fee that would be considered reasonable. Other factors would certainly include the number of beneficiaries, the need to investigate facts (as opposed to relying on the client to determine facts), tax issues that may arise, and the complexity of the inheritance tax determination, all of which seem to be present here.

Grob indicated that based upon his identification of approximately 80 hours of problematic entries on Carlson & Blakeman's billing statements, that many entries involved significant amounts of time to perform routine tasks, and because some duplication of efforts among multiple people, it was his opinion that 75 percent to 85 percent of the fees charged by Carlson & Blakeman were reasonable and that both the Estate and Trust bills should be reduced by 15 percent to 25 percent.

### (b) Luebbert's Testimony

Luebbert testified that he drafted Theresa's Trust in 1995, and, at that time, Theresa also executed a last will and testament and signed a bill of sale transferring her personal property to the Trust. He testified that at the time Theresa executed the documents, she understood the benefit of having a revocable trust in the event she became incapacitated. Luebbert also testified that he represented one of the beneficiaries between June 2022 and May 2023, but later withdrew after accepting a position with the Internal Revenue Service as an estate tax legal specialist. Luebbert opined that errors had been made in completing the Federal Estate Tax Return and that many things in the case were handled inappropriately, however, he did not provide an opinion as to the reasonableness of the fees charged by Carlson & Blakeman.

### (c) Spahn's Testimony

Spahn testified that in January 2023, she began representing Stauffer in his capacity as a cotrustee. After reviewing the case information, she drafted an email to Carlson expressing concerns regarding the case. Spahn testified that, during an in-person meeting that same month:

[Carlson] mentioned that he didn't know what he was going to do now that I'm on board, because he was planning on charging a percentage fee. And, now that I was coming on board, he didn't know how that was going to affect anything. And he also mentioned that he hadn't been keeping track of his billable time.

Spahn denied having any conversation with Carlson discussing a modification of Carlson & Blakeman's oral attorney fee agreement prior to receiving the written fee agreement in March 2023.

(d) Carlson's Testimony

Carlson testified that he represented Theresa in 2017, and at that time, she executed a will and a durable power of attorney. Carlson testified that in 2018, he filed a petition for guardianship/conservatorship on Theresa's behalf, which was dismissed by the court due to the existence of the durable power of attorney. Carlson testified that in March 2020, after receiving information that Theresa had been diagnosed with "moderately severe dementia," he advised Kevin that the power of attorney was active. After Theresa's death, Carlson began representing Kevin, as the personal representative in May or June 2022, and during an initial meeting with Kevin and Robert regarding Theresa's estate, the parties originally orally agreed to a percentage-based fee of 2 percent of Theresa's gross estate.

The following month, after Carlson discovered the existence of the Trust, he reiterated via a phone call with Robert that the fees for the representation in the Trust matter were the same. However, after discovering $8 million in Hershey stock owned by the Trust, Carlson orally agreed to reduce his fees to 1 percent with the right to increase back to 2 percent if litigation and disputes arose in the case. Carlson testified that his fee information was provided in various emails to other counsel and in a written letter to the beneficiaries in March 2023. At some point, Carlson testified that multiple disputes and accusations arose in the case, which allowed him to increase his percentage-based fee back to 2 percent.

Carlson testified that he did not prepare any conflict of interest waivers because he did not believe that a conflict of interest existed. Carlson stated that after Spahn expressed concerns that a conflict of interest existed, he contacted the Council for Discipline and was advised that there was no conflict of interest in continuing his representation of the personal representative and the cotrustees. Carlson denied Spahn's claim that during an in-person meeting, he told Spahn that he was not keeping track of his billable time.

Carlson testified that his firm's trust account contained approximately $430,000 for 5 months during which time that money was not earning any interest. Carlson testified that a day or two before preparing the written fee agreement, he discussed with Kevin about switching to an hourly fee instead of the percentage-based fee. Carlson testified that he further discussed switching to an hourly fee with Spahn, her clients, and some of the parties before the written fee agreement was prepared.

Carlson testified that he collected his fees from the firm's trust account on March 30, 2023. Although the last inventory showed total Estate and Trust assets of $11,290,241, Carlson based his fee on an hourly rate and charged $171,340 in reliance on the recently issued written fee agreement. Carlson testified that the fees charged and collected were reasonable, necessary, and fair. Carlson further denied that there were any duplicate billings; disagreed with Grob's report concerning problematic entries; and noted that there were many instances where the Estate and Trust were underbilled.

## (e) Wurstner's Testimony

Wurstner, an attorney at the Carlson & Blakeman law firm, testified that the bulk of his practice as an attorney was in probate matters, that he was an adjunct professor teaching trusts and estates, and that on a few occasions, he had presented to the bar association on billing ethics. Wurstner testified that during his representation in the present matter at the Carlson & Blakeman law firm, he charged $300 per hour and that his fees were reasonable, necessary, and fair.

Wurstner testified that he had to sort through six 7-inch high stacks of papers and a banker's box full of documents to determine whether any other current assets existed. While examining the documents, Wurstner discovered physical share certificates for the Hershey stock that had to be reregistered in the name of the Trust which required medallion signature guarantees. Wurstner testified that most of his work on the stock transfer was not billed. Wurstner testified that throughout the case, "we struggled with . . . getting information from Kevin, and it made it difficult to ascertain certain things."

## (f) Dostal's Testimony

Dostal, an attorney called on behalf of Carlson & Blakeman, testified that, since 1988, he has handled a significant number of trust and probate administration cases and approximately 60 percent of his law practice was in estate and trust administration and probate matters. Dostal testified that he was asked to investigate and come to an opinion about the attorney fees charged in the present case. In making that determination, Dostal reviewed significant documentation concerning the nature of the engagement of the firm and the services they provided; documentation to determine the nature of the trust and probate administration, and certain complexities within; the billing statements for the Estate and Trust; case files including the Federal Estate Tax Return, form 706; information related to the Hershey stock; and Grob's report. Dostal also had an opportunity to interrogate the attorneys involved on the nature of the services provided.

Dostal opined that the attorney fees charged in both the Estate and Trust cases were fair, reasonable, and necessarily incurred. Dostal testified that "given the complexities of the estate and trust for Theresa A. Meyers, the services rendered[,] and the hours incurred in the performance of those legal services was fair and reasonable and necessary for the estate and trust administration." Dostal testified that he did not find any information to suggest that the services or tasks had not been performed or that the attorneys were duplicating their efforts. As it related to Grob's expert opinion regarding the ten specific problematic entries, Dostal stated:

> [B]ased upon my review of the probate and trust administration, the complexities involved, and going back to the actual billing statements, I'm not sure why he pulled these 10 entries out and singled these out as problematic entries. In my opinion, those entries were detailed enough, with my background on the case, to realize that I believe that the services rendered and reflected on these 10 entries or so were, in fact reasonable for the services provided.

Dostal testified that "[a]n estate of this nature is, actually, from my investigation, one of the more complex trust and estate administrations."

### 3. Court Order

Following the trial, the county court found that that the hourly fee ultimately charged by Carlson & Blakeman "was fair and reasonable for an Estate [and Trust] matter such as this and that the individual attorneys and staff were competent to handle complex matters such as this Estate [and Trust] proceeding." The court further found that the hourly rate charged "was consistent with the customary hourly rates charged by attorneys with similar experience and expertise in Estate [and Trust] matters in the Douglas County area." The court ultimately concluded that the attorney fees charged by and paid to Carlson & Blakeman were "fair, reasonable, necessary, and not excessive." The court's finding was

> based upon the totality of the evidence which includes the complexity of this estate [and Trust], the length of time spent by [Carlson & Blakeman] dealing with the banking and investment entities, the time spent dealing with contentious parties, the time and expertise necessary dealing with tax issues and the large number of beneficiaries involved.

The court further found that a conflict of interest with Carlson & Blakeman did not exist and did not "justify a finding like that found in [*In re Estate of Watson*, 5 Neb. App. 184, 557 N.W. 2d 38 (1996)]." The Appellants have now appealed from the county court's finding that the fees charged by Carlson and Blakeman were reasonable.

## III. ASSIGNMENTS OF ERROR

Appellants assign, restated and renumbered, that the county court erred in: (1) failing to determine that Carlson had a conflict of interest in representing both the personal representative of the Estate and the cotrustees of the Trust; (2) failing to address the unclear nature of the fee agreement; and (3) improperly considering the reasonableness factors and determining the attorney fees were fair, reasonable, necessary, and not excessive.

## IV. STANDARD OF REVIEW

In reviewing the award of attorney fees in cases arising under Neb. Rev. Stat. § 30-2482 (Reissue 2016), the standard of review in the district court and appellate courts is for error appearing on the record. See *In re Estate of Nicholson*, 241 Neb. 447, 488 N.W.2d 554 (1992). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Estate of Gsantner*, 288 Neb. 222, 846 N.W.2d 646 (2014).

## V. ANALYSIS

### 1. Alleged Conflict of Interest

We first address Appellants' assignment that the court erred in finding Carlson did not have a conflict of interest in representing the personal representative of the Estate and the cotrustees of the Trust, because that assignment relates to whether Carlson was entitled to any compensation for his services.

An attorney who violates established rules of professional conduct and performs services despite a conflict of interest may not receive compensation for such services. *LeRette v. Howard*,

300 Neb. 128, 912 N.W.2d 706 (2018). We do not accept the contention that an attorney can receive fees for representation which from the outset gives the appearance of impropriety and is violative of established rules of professional conduct. *Id.* An attorney may not recover for services rendered if those services are rendered in contradiction to the requirements of professional responsibility and inconsistent with the character of the profession. *Id.*

Neb. Ct. R. of Prof. Cond. § 3-501.7 provides, in relevant part:

(a) Except as provided in paragraphs (b) and (c), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

Neb. Ct. R. of Prof. Cond. § 3-501.7 permits an attorney to represent more than one person if no conflict of interest exists. *Ross, Schroeder v. Artz*, 23 Neb. App. 545, 875 N.W.2d 457 (2016).

Appellants argue that there were three separate areas of conflict which precluded Carlson's representation of both the personal representative and the cotrustees. We will analyze those arguments below.

As it relates to Appellants' first argument, Appellants assert that Kevin's prior self-dealing involving a joint bank account with Theresa created a conflict of interest with the law firm subsequently representing Kevin as personal representative of the Estate. More specifically, Appellants assert that, having previously represented Kevin in his capacities as proposed guardian and conservator prior to Theresa's death and his capacity as attorney-in-fact under her power of attorney, when considered together with the evidence of Kevin's self-dealing, this should have alerted Carlson to a conflict of interest which prohibited his representation of the personal representative of the Estate and the cotrustees of the Trust.

Although Carlson did formerly represent Kevin in his proposed role as guardian and conservator and as power of attorney prior to Theresa's death, those facts alone do not pose a "significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or third person or by a personal interest of the lawyer." See Neb. Ct. R. of Prof. Cond. § 3-501.7(a)(2). And as it relates to evidence of potential self-dealing, that evidence was not discovered by Carlson until after he was hired by Kevin and the cotrustees. As Carlson explained, the discovery of the evidence of Kevin borrowing

from the bank account jointly titled in Kevin and Theresa's names led to his immediate disclosure of that evidence to the beneficiaries and ultimately led to his own withdrawal as counsel for all of the fiduciaries. On this record, we cannot say that the court erred in finding that no concurrent conflict existed, as that term is defined, when Carlson undertook representation of the fiduciaries in connection with the Estate and Trust.

We reach a similar conclusion regarding Appellants' argument that a concurrent conflict existed once Carlson discovered the existence of the Trust and undertook representation of the cotrustees and the personal representative. Although the subsequent will drafted by Carlson and the previously created Trust had different fiduciaries and some different beneficiaries, there is nothing in the record that demonstrated, at that time, there was a "significant risk" that a conflict existed. Although we most certainly recognize the potential for conflict arising under those circumstances, comment [8] to Neb. Ct. R. of Prof. Cond. § 3-501.7 provides, in relevant part:

> The mere possibility of subsequent harm does not itself require disclosure and consent. The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.

We find nothing in this record that demonstrates that at the point Carlson was retained to represent the cotrustees of the Trust and the personal representative of the Estate, there was a "significant risk" that representation of one would be adverse to the other, or that there was a "significant risk" that one of the clients would be materially limited by that representation of the other.

And as to Appellants' argument that language contained in the Will and Trust created a conflict governing the entity responsible for payment of taxes and apportionment, we note Carlson's unrefuted testimony set forth that the language in the instruments was clear and posed no conflict and that the court was only enlisted to provide instruction to the fiduciaries and beneficiaries involved so as to validate Carlson's own interpretation that the language itself was clear and unambiguous and did not pose an issue of conflict between his clients. Again, on this record, we find that the county court did not err in determining a concurrent conflict of interest was not present when Carlson was originally retained, and we reject Appellants' assignment that, on this record, Carlson was not entitled to any fees for having violated the Nebraska Court Rules of Professional Conduct.

## 2. FEE AGREEMENT

Appellants next assign and argue that the county court erred in failing to address the unclear nature of Carlson's fee agreement with the fiduciaries of the Estate and Trust. In support of this contention, they argue that the court eventually approved Carlson's bill that was based upon an hourly rate but failed to articulate what entitled Carlson to bill an hourly rate for his services.

The record demonstrates that Kevin, as personal representative, and Robert and Stauffer, as cotrustees, first retained Carlson under the terms of an oral agreement. Carlson was the only one to testify at trial on this subject and established that he originally agreed with the fiduciaries to charge 2 percent of the combined gross estate as depicted on the final inventory. Notwithstanding that agreement, Carlson testified that following the discovery that the Trust

contained nearly $8 million in Hershey stock, he revised the agreement with the consent of the fiduciaries and agreed to charge only 1 percent of the combined gross Estate. But in relation to that oral modification, Carlson testified that he reserved the right to increase the fee back to 2 percent "if litigation and disputes arise during the administration." But the question as to whether Carlson's fee was subsequently increased back to 2 percent is less clear. When questioned about the subject, the following colloquy occurred:

Q When . . . did you tell people that you were going from one percent back up to two?

A I said, if there was litigation, and it's repeated through all these documents, if there's litigations and disputes and this turns out being difficult because people are making it difficult, I'm not discounting my fees.

Q When did you tell the fiduciaries that you were changing your fees from one percent back up to two percent? Do you have any written evidence to show when you did that?

A That was done when I agreed and had discussions about lowering my fee. At that time, it was discussed and made very clear – and it's in writing a number of places, I'm talking about emails, I'm talking about fee agreement – that, if there's litigation and beneficiaries are going to fight, we're going back to two percent.

Notwithstanding the oral agreement, Carlson attempted to circulate his first written fee agreement on March 24, 2023. At that time, the potential conflict involving Kevin had been identified, and within approximately 2 weeks of producing the written fee agreement, Kevin resigned his position, and Carlson withdrew from representation. Although the proposed written fee agreement represented that the firm's fees were reduced from 2 percent to 1.5 percent (which contradicted Carlson's testimony that the fees were reduced to 1 percent), Carlson explained:

As this case has progressed and given the likelihood of litigation, it has become clear to us that a percentage fee is unrealistic. Further, it is apparent that we need to separate our fees for representing Kevin as POA on the real estate sale, and Bob as trustee, and that isn't possible with a percentage arrangement.

Accordingly, our fees will be billed at our usual hourly rate.

By the time Carlson circulated this fee agreement on March 24, 2023, he was no longer representing Stauffer. And, although Kevin and Weides executed the agreement, Stauffer did not.

Although the county court analyzed whether the hourly rates ultimately charged by Carlson to the Estate and Trust were reasonable, the court did not separately identify on what basis Carlson had the right to charge an hourly fee, and because the fee must be based upon the fee agreement Carlson had with his clients, we must first analyze whether Carlson had a right to charge an hourly rate based upon the fee agreement Carlson made with Kevin, Robert, and Stauffer. We find that he did not.

It is axiomatic that an attorney and client are free to contract for reasonable attorney fees rather than statutory attorney fees. *Byrne v. Hauptman, O'Brien*, 9 Neb. App. 77, 608 N.W.2d 208 (2000). We note that attorney fee agreements are evaluated at the time of their making and must be fair, reasonable, and fully explained to the client, and are strictly construed against the attorney.

*Id.* Our jurisprudence recognizes that an attorney fee agreement is different from conventional commercial contracts. *Hauptman, O'Brien v. Turco*, 273 Neb. 924, 735 N.W.2d 368 (2007). The difference arises from the fact that an attorney may not recover for services rendered if those services are rendered in contradiction to the requirements of professional responsibility and are inconsistent with the character of the profession. *Id*.

In this case, the parties agree that prior to Carlson circulating a written fee agreement in March 2023, they were operating under the terms of an oral fee agreement. And regardless of whether the current status of the fee in that oral agreement was 1 percent or 2 percent, as we discuss more later, there was no question that it was a three-party agreement among Carlson, the personal representative, and the cotrustees in that the total fee for all services was to be computed against the combined gross estate in both the Estate and Trust. In attempting to modify that three-party agreement, Carlson obtained the signatures of Kevin as personal representative, and Robert as cotrustee, but he failed to obtain the signature or agreement from Stauffer who, at that time, was represented by new counsel.

Neb. Rev. Stat. § 30-3805(a) (Cum. Supp. 2024) of Nebraska's Uniform Trust Code provides that "[e]xcept as otherwise provided in the terms of the trust, the Nebraska Uniform Trust Code governs the duties and powers of a trustee, relations among trustees, and the rights and interests of a beneficiary."

As it relates to the duties and powers of cotrustees, Neb. Rev. Stat. § 30-3859 (Cum. Supp. 2024) provides:

> (UTC 703)(a) Cotrustees who are unable to reach a unanimous decision may act by majority decision, except that any cotrustee may act independently as provided in section 30-901.
>
> (b) If a vacancy occurs in a cotrusteeship, the remaining cotrustees may act for the trust.
>
> (c) Subject to section 30-4312, a cotrustee must participate in the performance of a trustee's function unless the cotrustee is unavailable to perform the function because of absence, illness, disqualification under other law, or other temporary incapacity or the cotrustee has properly delegated the performance of the function to another trustee.
>
> (d) If a cotrustee is unavailable to perform duties because of absence, illness, disqualification under other law, or other temporary incapacity, and prompt action is necessary to achieve the purposes of the trust or to avoid injury to the trust property, the remaining cotrustee or a majority of the remaining cotrustees may act for the trust.
>
> (e) A trustee may not delegate to a cotrustee the performance of a function the settlor reasonably expected the trustees to perform jointly. Unless a delegation was irrevocable, a trustee may revoke a delegation previously made.
>
> (f) Except as otherwise provided in subsection (g) of this section, a trustee who does not join in an action of another trustee is not liable for the action.
>
> (g) Subject to section 30-4312, each trustee shall exercise reasonable care to:
>
> (1) prevent a cotrustee from committing a serious breach of trust; and
>
> (2) compel a cotrustee to redress a serious breach of trust.

(h) A dissenting trustee who joins in an action at the direction of the majority of the trustees and who notified any cotrustee of the dissent at or before the time of the action is not liable for the action unless the action is a serious breach of trust.

Thus, unless the terms of Theresa Meyer's Trust provided otherwise, because Theresa appointed cotrustees to administer the terms of her trust, an act of the trustees required, at a minimum, a majority decision.

The Trust agreement which governs the terms of the Trust, provides in section 12, in pertinent part:

Whenever more than one Trustee is acting, the following provisions apply where the context permits:

. . . .

12.3 Any action or decision of the majority of the Trustees

with respect to a matter as to, which they have joint powers shall be as effective as if taken or made by all Trustees. A nonconcurring Trustee shall not be liable for any act or failure to act of the other Trustee or for leaving the trust property in the custody or control of the other Trustee or Trustees.

Like the Uniform Trust Code, according to the provisions of the Trust, in order to constitute an action of the trustees, the matter required a majority of the trustees to be effective. As of March 24, 2023, there were two trustees for the Trust and only one agreed to its terms. Having not procured a decision of the majority of the trustees, the execution by one did not bind the Trust to the proposed modified fee agreement. A contract does not take effect unless each party to the contract manifests its consent to it. See *Fairchild v. Fairchild*, 176 Neb. 95, 125 N.W.2d 191 (1963). Carlson presented the original agreement as a three-party agreement for fees governing the combined estates. The proposed written agreement was presented as a modification of the original three-party agreement between Carlson, the personal representative, and the cotrustees. The agreement was executed by Carlson and Kevin as the personal representative but absent the majority vote required under the Trust, the cotrustees did not. Having failed to procure the signatures or agreement of all 3 parties, the modification did not become effective. See *Whalen v. U S West Communications*, 253 Neb. 334, 570 N.W.2d 531 (1997), *disapproved on other grounds, Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014) (holding three-party agreement not effective unless each party manifests consent to it).

Having determined that Carlson failed to obtain the consent of his clients to convert from a percentage fee to an hourly fee, we hold that the court erred in analyzing the fairness of Carlson's fees on the basis of an hourly charge. In an action to recover a fee, a lawyer has the burden of proving not only the extent and value of the services provided, but also the existence and terms of any fee contract. *St. John v. Gering Public Schools*, 302 Neb. 269, 923 N.W.2d 68 (2019). This is because when an attorney and a client enter into a valid fee agreement, the attorney is not automatically entitled to the reasonable value of the services provided. *Id.* The attorney's recovery is limited by the terms of the fee agreement. *Id.*

3. REASONABLENESS OF FEE

Appellants' final assignment of error is that the county court erred in finding that Carlson's hourly fees were reasonable. As we discussed above, we agree that the court erred in analyzing Carlson's fees charged at an hourly rate. The question thus becomes what was a reasonable fee under the circumstances of the oral fee arrangement.

As we discussed above, Carlson acknowledged that at one time, he had full agreement from Kevin, Robert, and Stauffer to charge 1 percent of the combined gross estate as reflected on the final inventory filed. But in his testimony, Carlson related that he reserved the right to charge 2 percent if litigation and disputes arose in the case. During trial, Carlson attempted to explain why, by March 2023, the rate had reverted back to 2 percent. In support of that claim, he argued that a number of disputes had arisen which justified a return to the original 2-percent fee. But when asked whether he ever communicated his decision or desire to return to the 2-percent fee, Carlson's responses appeared to suggest that the contingency was self-executing. As we understand it, Carlson asserts that, under the terms of the oral fee arrangement, as long as he could identify a dispute arising in the case, the fee automatically reverted back to 2 percent.

Neb. Ct. R. of Prof. Cond. § 3-501.5 (a) and (b) provides:

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. **Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.**

(Emphasis supplied.) Separately, Neb. Rev. Stat. § 30-2482 (Reissue 2016) allows all interested persons to challenge the reasonableness of a fee charged by an attorney in connection with the administration of the estate with a list of factors to determine its reasonableness.

Taken together, Carlson was required by both statutory authority and our rules of professional responsibility to clearly communicate his rate for services and he was only allowed

to charge a reasonable fee for those services. In this case, after learning about the extraordinary value of the Trust estate, he unequivocally instructed his clients that his rate would be reduced to 1 percent. And although he apparently reserved the right to increase the rate in the event of future disputes or litigation, the record indicates that he never notified his clients of the firm's decision to increase the rate back to 2 percent shortly before withdrawing. By professional rule, any change in the basis or rate of fees or expenses ***shall*** be communicated to the client. See Neb. Ct. R. of Prof. Cond. § 3-501.5(b) (Emphasis supplied). The record does not show any such communication.

And to the extent Carlson argues the provision was self-executing, the question of what constitutes a "dispute" or "litigation" which justified the doubling of the rate is at minimum an ambiguity, and as we said before, attorney fee agreements are strictly construed against the attorney. See *Byrne v. Hauptman, O'Brien*, 9 Neb. App. 77, 608 N.W.2d 208 (2000). Our interpretation that the fee remained at 1 percent at the time Carlson attempted to change to an hourly fee is further supported by the record. First, in the proposed written agreement, Carlson makes mention of the reserved right to increase fees back to 2 percent if difficulties arise, but then states, "as this case has progressed and given the likelihood of litigation," he desired to change the method of charging fees. But time spent on litigation and the likelihood of future litigation are different concepts. As such, Carlson's own statements do not support a finding that the oral fee agreement reverted to 2 percent because of the possibility of future litigation. Second, in his testimony, Carlson himself noted in describing his 2-percent rate:

> The fees don't change, it's two percent is our fee agreement. But never in my career have we charged two percent. We always look at it when we get done and, typically, we lower it. Never gone over it, ever. And we typically lower it. And as I told them, typically one percent is more like what would be fair and reasonable on a compensation percentage, but we'll see. And that's what we did.

On this record, we find that although Carlson may have reserved the right to increase his fee in the event of disputes or litigation, he had not done so by the time he withdrew from representation. And although Carlson was concerned that there was potential for litigation, that concern had not manifested itself at the time he attempted to change his fee agreement to an hourly rate. Because he was unsuccessful in changing the percentage rate to an hourly rate, we find that his fee for services at the time he withdrew from representation was 1 percent of the gross combined estate. As such, under the terms of the oral agreement, Carlson was entitled to $112,902.42 in connection with his representation.

Appellants also argue that the court erred in not reducing Carlson's rate because all services had not yet been completed at the time he withdrew from the case and because some of his services fell below the requisite standard of care. Although the record demonstrates that there were additional tasks to perform at the time of Carlson's withdrawal, it also demonstrates that Carlson continued to assist with those tasks due to impending deadlines after his withdrawal. And Carlson testified that, at the time of his withdrawal, the Estate was nearly 99 percent completed. On this record, applying the criteria required in assessing reasonable fees, after considering the expert testimony governing the complexity of the work performed, in conjunction with the county court's finding that Carlson's firm provided hourly services which were reasonable and which exceed the

1-percent fee he agreed to charge, we find Carlson's fee assessed at 1 percent of the combined estate was reasonable.

## VI. CONCLUSION

In sum, we reject the Appellants' claim that Carlson and his law firm had a conflict of interest in representing the personal representative and cotrustees of the Trust. However, regarding the attorney fees charged by Carlson and his firm, we find that Carlson failed to obtain the consent of his clients to convert from a percentage fee to an hourly fee; that the oral agreement for a 1-percent fee did not increase to 2 percent; and that the 1-percent fee which equated to $112,902.42 in connection with his representation of the Estate and Trust was reasonable. Accordingly, we affirm as modified.

AFFIRMED AS MODIFIED.